SCHUMACHER, ADMR., RESPONDENT, *v.* MURRAY HOS-
PITAL ET AL., APPELLANTS.

(No. 4,158.)

(Submitted June 4, 1920.  Decided November 8, 1920.)

[193 Pac. 397.]

*Physicians and Surgeons—Malpractice—Expert Testimony—*
*Extracts from Text-books—Evidence—X-ray Photographs—*
*Instructions.*

Trial—Incomplete Instructions—Duty of Appellant.
    1.  Failure to offer an instruction on the issues involved, more com-
    plete than the one submitted to the jury, bars the appellant from com-
    plaining of the one given.

Physicians and Surgeons—Malpractice—Evidence—Direct Examination—
Extracts from Medical Text-books Inadmissible.
    2.  In an action against a hospital and attending physicians for mal-
    practice it is error to permit counsel for plaintiff to incorporate in
    his questions to physicians in his case in chief statements from text-
    books on medical subjects.

Same—Extent of Care of Patient Required.
    3.  A patient who places himself in the care of a physician for a
    fractured hip-joint is entitled to an ordinarily careful and thorough
    examination, such as the circumstances, his condition and the physi-
    cian's opportunities for examination permit and demand.

Same—Failure to Take X-ray Photograph—Negligence—Jury Question.
    4.  The question whether the conditions surrounding decedent at the
    time he was taken to the hospital and during the time he remained
    there for treatment for an impacted fracture of the hip-joint de-
    manded the use of the X-ray was one for the jury's determination.

Same—X-Ray Photograph—Instruction—Improper Refusal.
    5.  *Held,* in view of the testimony of plaintiff's expert witnesses as
    to the circumstances under which they would use the X-ray, that the
    court erred in refusing defendants' offered instruction to the effect
    that the jury could not consider any reference to their failure to take
    an X-ray picture of decedent's hip unless plaintiff had proved that
    it was usual and customary under the circumstances for ordinarily
    skillful and careful physicians to take one, and that proof of such
    failure was not by itself evidence of negligence.

Appeal and Error—Settlement of Instructions—Failure to Object—Effect.
    6.  Grounds of objection to an instruction not urged at the settlement
    of the instructions will be disregarded on appeal.

Physicians and Surgeons—Failure of Patient to Obey Directions—In-
applicable Instruction.
    7.  Defendants' requested instruction that, if deceased had refused
    to adopt the remedies prescribed by or comply with the physicians' di-
    rections, and such refusal proximately contributed to his death, there
    could be no recovery, *held* properly refused in the absence of a plea of
    contributory negligence or substantial evidence showing such condition.

Same—Force of Expert Medical Testimony—Improper Instruction.

8. Defendants' requested instruction that the question whether or not they exercised reasonable and ordinary care and skill in the treatment of decedent was to be determined from the expert testimony of physicians and surgeons alone, *held* properly refused as taking from the jury consideration of the evidence of lay witnesses concerning conditions upon which their testimony was relevant and material.

Same—Expert Testimony—Proper Instruction.

9. Refusal of defendants' requested instruction that expert testimony based on hypothetical questions is entitled to importance only when fairly given by one properly accredited by his experience and study, *etc.*, *held* improper.

Trial — Cross-examination — Instruction to Disregard Testimony — Proper Refusal, When.

10. Where a party on cross-examination elicits statements in a colloquy with the witness upon a matter not touched upon in his direct examination, he is in no position to complain of the trial court's refusal to instruct the jury to disregard it.

Physicians and Surgeons—Methods of Treatment—Negligence.

11. *Held*, that it was error to refuse defendants' offered instruction that a physician or surgeon is not bound to use any particular method of treatment, and that if among practitioners of ordinary skill and learning more than one method of treatment is recognized as proper, it was not negligence for defendants to adopt either of such methods.

Same—Diagnosis of Injury—Error of Judgment not Negligence.

12. Error of judgment on the part of a physician or surgeon resulting in an incorrect diagnosis of a disease or injury does not alone render him liable in damages; nor does the fact that others might have adopted a different method of treatment convict him of negligence or want of skill or care; but if the method adopted has substantial medical support, it is sufficient.

[Liability of physician for lack of diligence in attending patient, see note in **Ann. Cas.** 1912C, 831.]

Same—Nonsuit—When Denial Proper.

13. Motion for nonsuit was properly denied in a malpractice case where, though most of the testimony of plaintiff's experts was not direct as to defendants' negligence and want of care or skill, one expert categorically stated that the treatment given the patient showed lack of care.

*Appeal from District Court, Silver Bow County; John B. McClernan, Judge.*

ACTION by H. J. Schumacher, as administrator of the estate of Edson Currier, deceased, against the Murray Hospital, a corporation, and others. From judgment for plaintiff and an order denying their motion for new trial, defendants appeal. Reversed and remanded.

*Messrs. Walker & Walker, Messrs. Kremer, Sanders & Kremer* and *Mr. James E. Murray,* for Appellants, submitted

a brief; *Mr. Louis P. Sanders* and *Mr. Murray* argued the cause orally.

There can be no recovery in a malpractice case without medical expert testimony to show lack of requisite skill and care on the part of the defendant. (*Ewing* v. *Goode,* 78 Fed. 442; *Sheldon* v. *Wright,* 80 Vt. 208, 67 Atl. 807; *Phebus* v. *Mather,* 181 Ill. App. 274; *Miller* v. *Toles,* 183 Mich. 252, L. R. A. 1915C, 595, 150 N. W. 118; *Zoterell* v. *Repp,* 187 Mich. 319, 153 N. W. 692; *Ball* v. *Skinner,* 134 Iowa, 298, 111 N. W. 1022; *Wilkins' Admr.* v. *Brock,* 81 Vt. 332, 70 Atl. 572; *McGraw* v. *Kerr,* 23 Colo. App. 163, 128 Pac. 870; *Miller* v. *Toles,* 183 Mich. 252, L. R. A. 1915C, 595, 150 N. W. 118.) Where there is a difference of opinion among practical and skillful surgeons as to the practice to be pursued in certain cases, a surgeon may exercise his own best judgment, employing the methods his experience has shown to be best, and error of judgment will not make him liable in damages. (*Van Hooser* v. *Berghoff,* 90 Mo. 487, 3 S. W. 72; *Ewing* v. *Goode, supra; English* v. *Free,* 205 Pa. St. 624, 55 Atl. 777; *De Long* v. *De Laney,* 206 Pa. St. 224, 55 Atl. 965; *Staloch* v. *Holm,* 100 Minn. 276, 9 L. R. A. (n. s.) 712, 111 N. W. 264.) A physician is not liable for an error in diagnosis, but in performing an operation, he is employing surgery as an art, and is then liable for negligence. (*Burnett* v. *Layman,* 133 Tenn. 323, 181 S. W. 157; *Nickerson* v. *Garish,* 114 Me. 354, 96 Atl. 235; *Von Boskirk* v. *Pinto,* 99 Neb. 164, 155 N. W. 889; *Sims* v. *Parker,* 41 Ill. App. 284.)

"Where the method adopted is shown to have the support of a respectable minority of physicians and was not unusual or experimental, a physician is not guilty of negligence"; and "That a physician adopted a particular method in reducing a fracture does not, where it had considerable medical support, show him to be guilty of negligence." (*Lorenz* v. *Booth,* 84 Wash. 550, 147 Pac. 31; *Dahl* v. *Wagner,* 87 Wash. 492, 151 Pac. 1079; *Houghton* v. *Dickson,* 29 Cal. App. 321, 155 Pac. 128.)

Were the testimony of respondent of such a character as to justify an argument that the appellants were negligent in not taking an X-ray picture, it is still not negligent in all cases to omit the use of an X-ray. There is no evidence in the record that an X-ray was usually employed by physicians or surgeons in similar localities under similar circumstances. This is the true and vital test. In the case of *Beadle* v. *Paine*, 46 Or.` 424, 80 Pac. 903, it is held that an instruction to the effect that it is not negligence not to have employed an X-ray unless it was usually employed by physicians and surgeons in that locality, stated the correct rule of law. (See, also, *Wells* v. *Ferry-Baker Lumber Co.*, 57 Wash. 658, 29 L. R. A. (n. s.) 426, 107 Pac. 869; *Spain* v. *Burch*, 169 Mo. App. 94, 154 S. W. 172; *Nickerson* v. *Garish*, 114 Me. 354, 96 Atl. 235.)

We invite the attention of the court to the following cases which render it clear that our contention that the evidence is insufficient is irresistible: *Ewing* v. *Goode*, 78 Fed. 442, 444; *James* v. *Robertson*, 39 Utah, 414, 117 Pac. 1068; *Merriam* v. *Hamilton*, 64 Or. 476, 130 Pac. 406, 408.

Counsel in interrogating the witness Kistler, on direct examination, read from a medical treatise by Scudder. Such examination is error. In some states it is allowable on cross-examination, but so far as we' can discover it is not permissible on direct. Under a statute similar to ours, the supreme court of California has held that medical works may not be read to the jury. (*Gallagher* v. *Market Street Ry. Co.*, 67 Cal. 13, 56 Am. Rep. 713, 6 Pac. 869; *City of Bloomington* v. *Shrock*, 110 Ill. 219, 51 Am. Rep. 678; *In re Mason*, 60 Hun, 46, 14 N. Y. Supp. 434; *Pahl* v. *Troy City Ry. Co.*, 81 App. Div. 308, 81 N. Y. Supp. 46; *Elliott* v. *Ferguson*, 37 Tex. Civ. 40, 83 S. W. 56; 2 Ency. of Evidence, 589 *et seq.*)

*Messrs. Maury, Wheeler & Melzner* and *Mr. Louis E. Haven*, for Respondent, submitted a brief; *Mr. Haven* and *Mr. B. K. Wheeler* argued the cause orally.

Counsel contend that because defendants used their best judgment, they could not be held liable. "It is a mistake

to say that if even an expert does what his judgment approves, he cannot be found negligent." (*Oceanic Steam Nav. Co.* v. *Aitken*, 196 U. S. 589, 49 L. Ed. 610, 25 Sup. Ct. Rep. 317 [see, also, Rose's U. S. Notes].) Whether errors of judgment will or will not make a physician liable in a given case depends not merely upon the fact that he may be ordinarily skillful as such, but whether he has treated the case skillfully or has exercised in its treatment such reasonable skill and diligence as is ordinarily exercised in his profession. (*West* v. *Martin*, 31 Mo. 375, 80 Am. Dec. 107; *Kline* v. *Nicholson*, 151 Iowa, 710, 130 N. W. 722; *Wilkins' Admr.* v. *Brock*, 81 Vt. 332, 70 Atl. 572; *McQuay* v. *Eastwood*, 12 Ont. 402; *Kruger* v. *McCaughey*, 149 Ill. App. 440; *McAlinden* v. *St. Maries Hospital Assn.*, 28 Idaho, 657, Ann. Cas. 1918A, 380, 156 Pac. 115; *United States* v. *Divino*, 12 Philippine I. 175; 30 Cyc. 1578.) "Although a physician may have exercised a proper degree of skill and care in his treatment of a case, still if he fails to give the patient or his attendants proper instructions best calculated to effect a cure, he is guilty of negligence for which he may be held liable." (*Beck* v. *German Klinik*, 78 Iowa, 696, 7 L. R. A. 566, 43 N. W. 617; *Carpenter* v. *Blake*, 75 N. Y. 12; 30 Cyc. 1577.)

"A patient is entitled to an ordinarily careful and thorough examination, such as the circumstances, the condition of the patient and the physician's opportunities for examination will permit." (*Burk* v. *Foster*, 114 Ky. 20, 1 Ann. Cas. 304, 59 L. R. A. 277, 69 S. W. 1096; *Stevenson* v. *Gelsthorpe*, 10 Mont. 563, 27 Pac. 404; 30 Cyc. 1575.) If there is reasonable opportunity for examination, and the nature of the injury or ailment can be discovered by the exercise of ordinary care and diligence, then a physician is answerable for failure to make such discovery. (*Manser* v. *Collins*, 69 Kan. 290, 76 Pac. 851; *Lewis* v. *Dwinell*, 84 Me. 497, 24 Atl. 945; *Quinn* v. *Donovan*, 85 Ill. 194; 30 Cyc. 1575.) So in this case it was just as proper to find out what appliances the defendants had at their

disposal as it was to ask them how many years they had been practicing or from what school they graduated.

In the case of *Viita* v. *Donlan,* 132 Minn. 128, 155 N. W. 1080, the supreme court of Minnesota laid down the rule that it was proper to ask questions relating to X-ray, even though there were no allegations of negligence relative to X-ray. (See, also, 30 Cyc. 1575, and *Burk* v. *Foster, supra.*)

The general rule adopted by the courts is that the opinions of expert witnesses are not, as a matter of law, to be accepted by the jury in place of their own judgment. (*Head* v. *Hargrave,* 105 U. S. 45, 26 L. Ed. 1028 [see, also, Rose's U. S. Notes].) Where the jury have before them all the facts upon which experts base their opinions, they are not conclusive, though they are entitled to respectful consideration. (*Commonwealth* v. *Moss,* 6 Kulp (Pa.), 31; *Chandler* v. *Barrett,* 21 La. Ann. 58, 99 Am. Dec. 701; *Leitensdorfer* v. *King,* 7 Colo. 436, 4 Pac. 37; *The Conqueror,* 166 U. S. 110, 41 L. Ed. 937, 17 Sup. Ct. Rep. 510 [see, also, Rose's U. S. Notes]; *People* v. *Barberi,* 12 N. Y. Cr. Rep. 89, 423, 47 N. Y. Supp. 168. See note to *Hull* v. *St. Louis,* 42 L. R. A. 753 [138 Mo. 618, 40 S. W. 89], where the matter is discussed at length.)

MR JUSTICE HURLY delivered the opinion of the court.

This is an action brought by the administrator of the estate of Edson Currier, deceased, for alleged malpractice growing out of the treatment of said Currier, following injuries which he had received in an accident.

Currier was employed by the Anaconda Copper Mining Company at the West Colusa mine in Silver Bow county on the twenty-ninth day of December, 1913, and for some time prior thereto, on which date he was injured, sustaining an impacted fracture of the right hip-joint or neck of the femur, accompanied with a dislocation of the hip-joint, while in the discharge of his duties. The Murray Hospital, under a contract between it and the mining company for the benefit of

its employees, was obliged to furnish surgical and medical care, treatment and attention to the employees of said mining company, for which service the employees, including Currier, had paid a stated sum per month during the time of their employment. After receiving the injuries referred to, and under the terms of said contract, Currier was taken to the hospital and placed under the care of the hospital and its physicians, among whom are the defendants above named. The evidence discloses that, after Currier was taken to the hospital, his hip was examined by its employees, who diagnosed his injury as a dislocation of the hip-joint. It is alleged in the complaint that the defendants treated his injuries as a dislocation for a period of about fifty days, during all of which time it is alleged that Currier was suffering from an impacted fracture of the hip-joint, rather than a dislocation, and that the defendants carelessly and negligently failed to treat the said fracture as such until about fifty days after Currier received the same, and carelessly and negligently failed to properly treat the said fracture at any time or at all. It is further alleged that the defendants at all times in the complaint mentioned had at their disposal an X-ray apparatus for making examinations, but that they carelessly, negligently and unskillfully failed to properly diagnose the said fracture by the means at their disposal, including said X-ray apparatus, and likewise failed to give to said hip the continued treatment which the same needed and required, and that by reason thereof Currier suffered great physical pain and mental anguish, and that an abscess developed on his hip, causing an infection which later caused his death.

At the close of the case defendants moved the court for a nonsuit upon the ground that the evidence was insufficient to justify a verdict in favor of plaintiff. The motion was granted as to defendant T. J. Murray but denied as to the remaining defendants. Plaintiff had verdict. From the judgment thereon, and from an order denying a motion for a new trial, the defendants appealed.

There was testimony on the part of the plaintiff that Currier, when brought to the hospital, was suffering from wounds upon his head and also from injuries to his hip; that, because of the severity of the shock sustained, it was deemed inadvisable to attempt to put him under an anesthetic just then. His head wounds were dressed, and provision was made for keeping the patient at rest until the shock condition had subsided.  Upon the following day the patient was removed to the operating-room, placed under an anesthetic, and his head wounds further dressed and cared for.  The physicians in charge examined the injury to the hip, and testified that all the conditions were typical of an ordinary posterior dislocation.  There is given in considerable detail the steps taken by them in handling, reducing and treating the dislocation; that measurements were taken of Currier's limbs; that no shortening of the limb existed, *etc.;* that the leg was firm and rigid; that no evidence of a fracture was discovered by them; and that there was nothing to indicate such fracture.  The patient was then removed to his room.  On the thirteenth day the physicians in charge told the nurse to have the patient sit up in bed, and with the aid of pillows and other supports he was propped up in bed, and this was done each day following.  Later one of the physicians (Dr. Blake) told Currier he should get up and move around on crutches.  Dr. Blake brought him crutches, and, with the assistance of the doctor and of Mrs. Currier and a nurse, he got out of bed. Mrs. Currier testified that he was directed by the doctor to place his foot upon the floor and put his weight thereon and to walk around on the crutches, which he did thereafter every day, spending part of the time each day in a wheeled chair, until he was later operated upon.  The testimony of Mrs. Currier as to the first occasion when he used the crutches is that this occurred about the twenty-second or twenty-third day after he came to the hospital.  There is also testimony by Mrs. Currier that deceased complained of intense pain when propped up in bed and in getting out of bed and moving

around.  On the thirty-sixth day an X-ray picture of the hip was taken, which disclosed that Currier had an impacted fracture of the neck of the femur.  After the discovery of this fracture no change was made in the treatment, and Currier continued to get up and move around the room at the request of the doctor in charge.  On or about the fifty-second day, his leg being then swollen, he was taken to the operating-room, and an incision made in his perineum, in which was found a considerable quantity of pus.  Upon the following day another operation was performed and more pus removed.  Mrs. Currier testified that at the time one of the physicians conducting the operation said, "That is where the trouble is coming from."  Some time thereafter (as testified by Mrs. Currier, about two to two and one-half weeks) the doctors opened the incision and then found that the bone was honey-combed and broken, when the physicians cut away the decayed portions.  She testified that one of the operators then said, "That was the seat of the trouble."  No splints or supports were placed upon the hip at any time, though the wounds caused by the operation were dressed and bandaged.  On or about the eighty-fourth day Currier died, concededly from septic poisoning.

It is conceded by practically all of the physicians, whether testifying for the plaintiff or the defendants, that an impacted fracture of the neck of the femur presents unusual difficulties in treatment and diagnosis, and that such an injury is of a very serious nature to the patient.

There is also testimony to the effect that Currier was suffering from stricture of the urethra.  One of the physicians testified that Currier, shortly after coming to the hospital, informed him that he was suffering from the effects of gonorrhea, contracted some considerable time previously, and that he did not want the fact disclosed to his wife, and that it was not made known to her.  For some days, to permit urination, he was catheterized.  After his death an autopsy was held, when, in addition to the impacted fracture, the

honeycombed condition of the bone, and a purulent condition in the hip, a slight amount of pus was found in the pole of the right kidney, about a dram in quantity. Otherwise his internal organs were found to be normal.

It is contended by the defendants that the septic condition which caused his death was because of the gonorrhea and stricture, and that, when injured by the accident, the germs passed through the lymphatic system and found lodgment in the hip, the spot of weakest resistance in his system, and that the purulent condition of the hip was in no wise caused by lack of care, nor could it have been prevented by the exercise of care and treatment. There is testimony as to the treatment given him for the stricture. Mrs. Currier denies that he suffered from gonorrhea, and testified that for about eighteen years prior to the accident she had been his wife, during which time they had sustained the usual relations of husband and wife, and that she had never contracted the disease. There is also medical testimony that, had he suffered from gonorrhea, she would have been likely to contract the same. Special interrogatories were submitted to the jury as to whether Currier was suffering from stricture or gonorrhea, and as to whether the septic condition was caused by such afflictions. Upon these the jury found in the negative.

Appellants' first specification is based upon the court's [1] statement of the issues in its instructions to the jury. We think the statement was sufficient. However, had defendants desired a more complete instruction, it was their duty to tender one.

Plaintiff's counsel, in examining physicians testifying in his [2] behalf, in framing certain questions, included therein statements from text-books on medical subjects. This was objected to by defendants, and they now contend that such rulings constituted reversible error.

Experts are permitted to give their conclusions because of their presumed knowledge of subjects with which the ordinary layman or juror is not conversant. These opinions may be

the result of their actual experience, or because of theoretical knowledge based upon special study of the subject. The testimony given by them is necessarily in the nature of a conclusion in most instances, and likewise is largely in the nature of hearsay. For a witness whose fitness is thus determined to be permitted upon his direct examination to merely state that he agrees with the text of a certain writer is in effect to permit the reception in evidence not only of the expert's opinion, but likewise to permit the unsworn statement of another to go to the jury without opportunity for cross-examination. It is permissible, and perhaps necessary and advisable in most instances, for the expert to state his experience, knowledge and other qualifications, even stating the source of his knowledge; but we are not inclined to extend the rule to permit the introduction of statements of text-writers upon medical subjects as part of the direct evidence. There is a clear distinction between so doing, and the rule announced by this court in *Emerson* v. *Butte Electric Ry. Co.,* 46 Mont. 454, 129 Pac. 319, and *State* v. *Penna,* 35 Mont. 535, 90 Pac. 787. (See 2 Encyclopedia of Evidence, 589 *et seq.; City of Bloomington* v. *Shrock,* 110 Ill. 219, 51 Am. Rep. 678; *In re Mason,* 60 Hun, 46, 14 N. Y. Supp. 434; *Pahl* v. *Troy City Ry. Co.,* 81 App. Div. 308, 81 N. Y. Supp. 46; *Elliott* v. *Ferguson,* 37 Tex. Civ. App. 40, 83 S. W. 56.)

Error is also assigned because plaintiff's counsel was [3-5] permitted to inquire of witnesses whether, if an X-ray had been taken of the injured limb when Currier was brought to the hospital, the fracture would have been discovered, and also to the refusal of the court to instruct the jury as follows: "You are instructed that you cannot consider any of the testimony in this case with reference to the failure of the defendants to take an X-ray picture of the hip of the deceased unless from the evidence you find that the plaintiff has proved by a preponderance of the evidence that it was usual and customary under like circumstances to take an X-ray photograph, and that ordinarily skillful and careful physicians and

surgeons under similar circumstances would have done so. Proof of the failure of the defendants to take an X-ray photograph of the hip of the deceased by itself is not evidence of negligence on their part."

Currier was entitled to an ordinarily careful and thorough examination, such as the circumstances, the condition of the patient and the physician's opportunities for examination permitted and demanded. (30 Cyc. 1575; *Burk* v. *Foster,* 114 Ky. 20, Ann. Cas. 304, 59 L. R. A. 277, 69 S. W. 1096.) In *Stevenson* v. *Gelsthorpe,* 10 Mont. 563, 27 Pac. 404, this court said: "The physician is under an implied obligation, when he undertakes to treat diseases or injuries, to bring to his aid such obtainable remedies and appliances as discovery and experience have found to be the most appropriate and beneficial in aiding recovery. But in some cases the best and most appropriate appliances or remedies may be very simple and commonplace, and it may be the highest type of skill which applies these simple things to aid nature in it healing processes."

It is undisputed that defendants did not use the X-ray until the thirty-sixth day. The physicians in effect say they had no reason to suspect the existence of the fracture, and that, even if they had discovered it earlier, there would have been no change in the treatment under the conditions existing, and it conclusively appears that there was no change in treatment prior to the discovery of symptoms indicating pus. Plaintiff's experts were asked if the failure to use the X-ray under the conditions was want of care. To this question Dr. Sullivan answered: "If, assuming that a man had an injury to the hip, and having an X-ray machine at my disposal *if I had any doubt whatever as to the condition existing,* I would use the X-ray." Again, in answer to a hypothetical question, he testified: "Well, I would say in a condition of that kind, *if the physician had any doubt as to the diagnosis,* why I say they didn't use the means that ordinarily are used, having an X-ray to find out what the diagnosis was. But the question does not presuppose whether or not there was any

question as to the diagnosis of the condition; *if there was any doubt as to the injury,* why, then, they should have used the X-ray machine, having one at their disposal, in my opinion, at that time." Once more he testified: "Well, assuming all those facts as you stated, and that these two conditions did exist, and that only one of them was found, I would say that, using ordinary care, it should have been used, *if there was any doubt as to the diagnosis."* Later he said: "Well, if the question was asked to know whether or not under those conditions I would have used the X-ray, having one at my disposal, why, I would always use one in my own personal practice; I would always use it under a condition of that kind where I had one at my disposal, where an injury to the hip; even if I was positive of the condition, I would use it to satisfy myself. *Of course, other doctors might not do so, but that is simply my treatment."*

Dr. Matthews, another witness for plaintiff, testified: "Personally I absolutely refuse to treat fractures without an X-ray picture." He also testified: "As to the use of the X-ray machine in cases of impaction in Butte, in December, 1913, and the early months of 1914, I know what my practice in the use of it was; I don't know the general practice."

Deceased was entitled to a careful examination. Whether the conditions surrounding the patient demanded the use of the X-ray was a question for the jury. An examination with the aid of the X-ray would have disclosed the fracture. The testimony was elicited with the evident intent of showing that the failure to use the X-ray was want of care, and to show that Currier was not given a proper examination. In view of the answers of the experts, as given above, as to the circumstances under which they use the X-ray, the defendants were entitled to the benefit of the instruction. Whether or not the physicians were guilty of failure to use reasonable care and diligence in discovering the extent of Currier's injuries was necessarily involved in the question as to whether he received proper treatment and examination. The only

positive testimony as to negligence or want of care because of
the failure to use the X-ray was as given above. The instruc-
tion was applicable to the evidence and embraced correct prin-
ciples of law.

The answers of Dr. Sullivan and Dr. Matthews do not dis-
close the necessity of the use of the X-ray except in case of
doubt, and Dr. Matthews merely says that he uses it in his,
own practice in all cases, but does not know the practice of
others in that regard. Such testimony does not prove negli-
gence nor want of care or skill. Under any conditions,
whether or not failure to use the X-ray to determine the
nature and extent of Currier's injuries was a question to be
decided by the jury and the instruction should have been
given. (*Viita* v. *Donlan*, 132 Minn. 128, 155 N. W. 1080;
*Stevenson* v. *Yates*, 183 Ky. 196, 208 S. W. 820. See, also,
*Wojciechowski* v. *Coryell* (Mo.), 217 S. W. 638.)

Appellants urge objection to instruction No. 18 upon
[6]    grounds not contained in those made at the settlement of
the instructions, and we therefore disregard the same.

Appellants tendered an instruction to the effect that if
[7]    Currier, by refusing to adopt the remedies or to comply
with directions of the defendants, proximately contributed
to his death, there should be no recovery by the plaintiff.
The court refused to give the instructions. There was no plea
of contributory negligence, and there is only evidence indicat-
ing some slight petulance on the part of the patient in refus-
ing treatment by Dr. Schwartz on one occasion, which the
doctor later testified would not have changed the result. On
the evening Currier was brought to the hospital he objected
to having anything done to his hip. The physicians testified
that because of his condition they did not feel it wise to at-
tempt to adjust the hip before the next day. There was there-
fore nothing to justify the giving of the instruction.

Appellants requested the court to instruct the jury: "No.
39. The court instructs the jury that the question as to whether
[8, 9]    or not the defendants in treating the injury of which

Edson Currier complained used that degree of reasonable and ordinary care and skill used by physicians and surgeons engaged in the same line of practice in similar localities is a question to be determined from the expert testimony of physicians and surgeons, and the jury must base its findings as to such question upon the testimony submitted by the physicians and surgeons as expert witnesses herein relative thereto.''
Also:

"No. 46.   You are instructed that expert evidence is entitled to importance only when fairly given by one properly accredited through his experience and study in the particular science upon an hypothesis which is true in the relation of its parts to the whole case, which is the subject of inquiry; that is to say, the value of the opinion of an expert witness depends upon the knowledge, learning, and experience of the expert and upon the facts upon which it is based.   Therefore in this case, if you find that the opinions expressed by any expert testifying herein were given in answer to hypothetical questions which were incomplete in the presentation of the material facts as shown by the evidence, you are at liberty to give the testimony of such expert only such weight as you believe it may be entitled to in view of all of the established facts in the case.''

In *Miller* v. *Toles*, 183 Mich. 252, L. R. A. 1915C, 595, 150 N. W. 118, it is said: "It appears to be the contention of the plaintiff that, having laid before the jury the facts surrounding the injury, the subsequent treatment, and the ultimate loss of the limb, the jury, in the absence of all testimony of an expert character tending to show malpractice, should be permitted to draw inferences of negligent conduct on the part of defendant.   We have had occasion, very recently, to pass upon this identical question.   In the case of *Farrell* v. *Haze*, 157 Mich. 374, 122 N. W. 197, the following request to charge was submitted on behalf of the defendant: 'The question whether the loss of the plaintiff's foot was attributable to anything that the plaintiff claims the defendant did or omitted

to do is a scientific question, which the jury cannot determine for itself, and can only be answered by an expert; and, inasmuch as no expert or medical man or surgeon has stated that the loss of the foot, in his opinion, came from anything the defendant did or omitted to do, therefore I charge you that you cannot take the loss of the foot into consideration in this case or hold the defendant liable therefor.' We held, at page 392 of 157 Mich., at page 197 of 122 N. W., that the proffered request should have been given. Upon the same point see, also, *Wood* v. *Barker,* 49 Mich. 295, 13 N. W. 597; *Mayo* v. *Wright,* 63 Mich. 32, 29 N. W. 832; *Spaulding* v. *Bliss,* 83 Mich. 311, 47 N. W. 210; and *Neifert* v. *Hasley,* 149 Mich. 232, 112 N. W. 705." In the above case, however, it is apparent that there was a total lack of expert testimony.

In *Ewing* v. *Goode* (C. C.), 78 Fed. 442, in the federal circuit court of Ohio, Taft, Judge, said: "In many cases expert evidence, though all tending one way, is not conclusive upon the court and jury, but the latter, as men of affairs, may draw their own inferences from the facts, and accept or reject the statements of experts; but such cases are where the subject of discussion is on the border line between the domain of general and expert knowledge, as, for instance, where the value of land is involved, or where the value of professional services is in dispute. There the mode of reaching conclusions from the facts when stated is not so different from the inferences of common knowledge that expert testimony can be anything more than a mere guide. But when a case concerns the highly specialized art of treating an eye for cataract, or for the mysterious and dread disease of glaucoma, with respect to which a layman can have no knowledge at all, the court and jury must be dependent on expert evidence. There can be no other guide, and, where want of skill or attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury. Again, when the burden of proof is on the plaintiff to show that the injury was negligently caused by defendant, it is not enough

to show the injury, together with the expert opinion that it might have occurred from negligence and many other causes. Such evidence has no tendency to show that negligence did cause the injury. When a plaintiff produces evidence that is consistent with an hypothesis that the defendant is not negligent, and also with one that he is, his proof tends to establish neither. (*Louisville & N. R. Co.* v. *East Tennessee, V. & D. Ry. Co.*, 60 Fed. 993, 22 U. S. App. 102, 114, 9 C. C. A. 314; *Ellis* v. *Railway Co.*, L. R. 9 C. P. 551.)" See, also, *Hull* v. *City of St. Louis,* 138 Mo. 618, 42 L. R. A. 753, 40 S. W. 89, in which latter report is a very exhaustive note upon the subject.

The supreme court of Iowa, in discussing the subject, said: "These questions are to be determined, of course, in the light of expert evidence as to what a reasonably judicious and careful physician would do under like circumstances; but it was for the jury to say whether, in the light of the expert evidence, the plaintiff did exercise the care, skill and judgment required. [Citing authorities.]" (*Kline* v. *Nicholson,* 151 Iowa, 710, 130 N. W. 722.)

In the earlier case of *Ball* v. *Skinner,* 134 Iowa, 298, 111 N. W. 1022, the same court held: "A study of the precedents will develop some confusion in the statement of rules governing the weight and effect to be given expert testimony; but the reasonable rule, applicable at least to the great majority of cases, would seem to be that expert testimony is to be given consideration like all other testimony which the court allows to go to the jury, and accorded such weight as, in view of all the evidence of every kind and nature and its reasonableness and the apparent candor and competency of the witnesses, in fairness demand. (See note to *Hull* v. *St. Louis,* 42 L. R. A. 753 (138 Mo. 618, 40 S. W. 89.) All this is but another way of stating the elementary doctrine that the jury is to give the evidence, and all of it, full and fair consideration, and therefrom draw the conclusion which the judgments and consciences of the jurors approve as just and right."

The case of *Sheldon* v. *Wright*, 80 Vt. 208, 67 Atl. 807, dealt with a request for instructions somewhat similar to instruction No. 39, quoted above. In discussing the same the court said: "By several requests the defendant asked the court to charge, in substance, that in passing on the treatment he had given the plaintiff's leg the jury must consider only the expert evidence, the defendant's own testimony, and whatever admissions or declarations he had made. These requests were refused, and rightly. In determining the facts about the previous condition of the leg, about the injury, and about the operation and the subsequent treatment, the testimony of various nonexpert witnesses was for consideration, as well as the testimony and admissions of the defendant. The plaintiff himself appears to have testified to a great variety of facts relevant to the treatment. The form of these requests was varied, but all were fallacious. The expert testimony would have been of no concrete value without a determination of facts which were to be determined by a consideration of every piece of relevant evidence, whatever its source."

Judging from the text of the decision *supra,* the instruction there condemned is more comprehensive than No. 39, above. The refused instruction would limit the jury in its consideration of the case not only to the opinion of the experts as to what is the proper standard in the matter of care and treatment, but also to their opinion, and theirs only, as to whether or not the defendants actually rendered the care and attention necessary and proper, and would in effect direct the jury to disregard all facts detailed by lay witnesses concerning conditions upon which their testimony was relevant and material. There can be no question that recovery could not be had without expert testimony supporting the charge of malpractice, and the cases cited above are in accord with the great weight of authority. This court has previously expressed such views in *Stevenson* v. *Gelsthorpe, supra,* as follows: "It was reserved to those witnesses, learned in the science of medicine

and surgery, and experienced in the treatment of such cases, to give the necessary evidence as to whether the treatment described was proper and skillful or negligent and unskillful, and whether good or injurious results flowed therefrom.'' With that statement we agree; but to give an instruction in the language of proposed No. 39, we feel, takes from the jury, as indicated above, consideration of evidence necessary to a determination of the issues. Of course, in the absence of expert testimony in behalf of the plaintiff in a malpractice case, the court is not justified in submitting the same to the jury. But, when competent expert evidence has been received, it is to be considered by the jury only as other evidence in the case.

Proposed instruction No. 46 should, upon request, have been given. It is in accord with the rules pertaining to expert testimony and answers to hypothetical questions. This court has said: ''It was for the jury to say, after considering all the evidence introduced on both sides, whether the facts, thus assumed as established for the time being, were really established, and whether the opinion of the witness was worthy of consideration. (Lawson on Expert Evidence, 152, 153; 1 Thompson on Trials, secs. 607–610, and cases cited.)'' (*State v. Crowe,* 39 Mont. 174, 102 Pac. 579.)

Defendants tendered an instruction directing the jury to [10] disregard certain statements made by the witness Tyler upon cross-examination, which the court refused to give. These statements were developed by defendants' counsel and were responsive to questions asked the witness. No motion was made to strike them out, and probably such motion would not have been sustained if made. Appellants, having brought forth this evidence in a colloquy with the witness upon a matter not touched upon in the direct examination, are in no position to complain because the court refused to strike it out.

The court also refused to give instruction No. 45, tendered by defendants, as follows:

"The court instructs the jury that a physician or surgeon [11, 12] is not bound to use any particular method of treatment, and if among physicians and surgeons of ordinary skill and learning more than one method of treatment is recognized as proper, it is not negligence for the defendants to adopt either of such methods; and the fact that some other method of treatment existed, or some other physician or surgeon testified in this case that he might or would have used or advised the other or different method, does not even tend to establish negligence or improper examination or treatment on the part of the defendants; nor would it be an act of negligence or impropriety for the defendants not to have adopted such method, so testified to by such other physician or surgeon herein."

As to whether error of judgment upon the part of a physician resulting in an incorrect diagnosis of the disease or injury from which his patient is suffering renders him liable is a question which has been frequently passed upon by the courts. In *West* v. *Martin*, 31 Mo. 375, 80 Am. Dec. 107, the court said: "Whether errors of judgment will or will not make a surgeon liable in a given case depends, not merely upon the fact that he may be ordinarily skillful as such, but whether he has treated the case skillfully or has exercised in its treatment such reasonable skill and diligence as is ordinarily exercised in his profession. For there may be responsibility where there is no neglect, if the error of judgment be so gross as to be inconsistent with the use of that degree of skill that it is the duty of every surgeon to bring to the treatment of the case according to the standard indicated." (See, also, *Hansen* v. *Pock*, 57 Mont. 51, 187 Pac. 282; *Dorris* v. *Warford*, 124 Ky. 768, 100 S. W. 312; 30 Cyc. 1578.)

Nor does the fact that other physicians might have adopted other methods necessarily render the attending physician liable, nor show negligence or want of skill or care. If the method adopted is one which has substantial medical support, it is sufficient. (*Cozine* v. *Moore*, 159 Iowa, 472, 141 N. W.

424; *Lorenz* v. *Booth,* 84 Wash. 550, 147 Pac. 31; *Spain* v. *Burch,* 169 Mo. App. 94, 154 S. W. 172; *Leighton* v. *Sargent,* 27 N. H. 460, 59 Am. Dec. 388; *Kline* v. *Nicholson,* 151 Iowa, 710, 130 N. W. 722.) And, where there is a difference of opinion among practical and skillful surgeons as to the practice to be pursued in certain cases, a physician may exercise his own best judgment, employing the methods his experience may have shown to be best, and mere error of judgment will not make him liable in damages, in the absence of a showing of want of care and skill. (*Van Hooser* v. *Berghoff,* 90 Mo. 487, 3 S. W. 72; *Ewing* v. *Goode, supra; English* v. *Free,* 205 Pa. 624, 55 Atl. 777; *De Long* v. *De Laney,* 206 Pa. 224, 55 Atl. 965; *Staloch* v. *Holm,* 100 Minn. 276, 9 L. R. A. (n. s.) 712, 111 N. W. 264.)

Nor is an incorrect diagnosis of itself sufficient to establish liability. The plaintiff must show that such mistake was due to failure to use ordinary care and diligence and to exercise reasonable learning, skill and judgment in his examination and treatment. (*Nickerson* v. *Garish,* 114 Me. 354, 96 Atl. 235; *Von Boskirk* v. *Pinto,* 99 Neb. 164, 155 N. W. 889; *Sims* v. *Parker,* 41 Ill. App. 284; *Willard* v. *Norcross,* 86 Vt. 426, 85 Atl. 904; *Staloch* v. *Holm, supra; Brydges* v. *Cunningham,* 69 Wash. 8, 124 Pac. 131.)

In *Hier* v. *Stites,* 91 Ohio St. 127, 110 N. E. 252, the court said: "In an action against a physician and surgeon for negligent treatment, * * * plaintiff must show that defendant's treatment either did something that physicians and surgeons of ordinary care, skill and diligence would not have done under like or similar conditions, or that defendant omitted to do some particular thing they would have done under like or similar conditions, and must further show that the injury * * * resulted from the neglect or omission shown."

The instruction should have been given.

Defendants contend that the plaintiff's evidence tends to [13] show, at most, error of judgment upon their part in

their diagnosis, and that there is no medical expert testimony showing lack of ordinarily reasonable care and skill, and that therefore the plaintiff failed to establish the case; and it is strenuously insisted that the evidence is insufficient to support the verdict. The transcript of the testimony consists of nearly 500 pages, and we will not attempt to set it forth in detail, particularly in view of the necessary reversal of the judgment and order upon other grounds. It is sufficient to say that, while the testimony of the physicians testifying in behalf of the plaintiff was in most instances not direct as to the alleged negligence and want of care or skill displayed by the defendants, Dr. Sullivan (plaintiff's witness) testified in answer to a hypothetical question that the septic condition of Currier was due to the honeycombed condition of the bone, and Dr. Matthews, also a witness for plaintiff, categorically testified that the treatment given, in his opinion, showed a lack of care. This, in our opinion, was sufficient to justify denial of the motion for nonsuit. (*Hanson* v. *Thelan* (N. D.), 173 N. W. 457; *Eicholz* v. *Poe* (Mo.), 217 S. W. 282; *McAlinden* v. *St. Maries Hosp. Assn.*, 28 Idaho, 657, Ann. Cas. 1918A, 380, 56 Pac. 115; *Adams* v. *Bunker Hill Min. Co.*, 12 Idaho, 650, 11 L. R. A. (n. s.) 844, 89 Pac. 624.)

The judgment and order are reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. JUSTICE MATTHEWS concurs.

MR. CHIEF JUSTICE BRANTLY: I concur in the reversal of the judgment for the reasons stated by Mr. Justice HURLY in the majority opinion. I am of the opinion, however, that there was not sufficient evidence to require the submission of the case to the jury.

From the nature of this class of cases, as abundantly appears from the authorities cited in the original opinion, there must be some expert testimony tending to show that the

diagnosis made and course of treatment adopted by the attending physician were negligent and unskillful, and also that they were the proximate cause of the injury or death which is the basis of the action. The excerpts quoted from the testimony of Drs. Sullivan and Matthews—and these constituted all the evidence on the subject—not only do not tend to show that the defendants were guilty of negligence in failing to use the X-ray machine in making their diagnosis, but do not tend in any way to establish that this failure resulted in the death of Currier. On the contrary, the testimony of defendants' witnesses, which was not contradicted, was that, even if the X-ray machine had been used and the impacted fracture discovered, the course of treatment adopted from the first should have been the same. Besides, no expert witness expressed the opinion that the course of treatment adopted caused the septic condition which resulted in Currier's death. For these reasons, I think the court should have granted a nonsuit as to all of the defendants.

MR. JUSTICE HOLLOWAY: I concur in the order of reversal, but not in all that is said in its support. In my judgment, the evidence is insufficient to justify the submission of the case to the jury.